OF THE STATE OF ARKANSAS. **423**

Term, 1857.]                Biscoe et al. vs. Coulter et al.

### Biscoe et al. vs. Coulter et al.

The Auditor's deed for land, forfeited for non-payment of taxes and sold under the statute, (*Dig. ch.* 139, *sec.* 131 *to* 147,) is to be treated in the Courts as *prima facie* evidence that all things required by law to be done to make a good and valid sale, were done by the collector and Auditor: and it is incumbent upon the party assailing the title of the purchaser, to show affirmatively a non-compliance with some substantial requisite of the law. (*Merrick & Fenno vs. Hutt*, 15 *Ark.* 331; *Patrick vs. Davis*, 15 *Ark.* 363.

Where the collector, instead of offering for sale, separately, each tract of land advertised to be sold for taxes, presents the list to the persons present, and offers to sell if they would buy, and they all reply that they will not buy any of them, it is but fair to presume that no injury resulted to the owners of the lands by the failure of the collector to comply with the letter of the statute in the mode of offering the lands for sale. But this Court would not encourage or sanction any substantial departure from it, under any circumstances.

A denial in the answer, when responsive to an allegation in the bill, of a matter not alleged to be within the peculiar knowledge of the respondent, will be treated as merely putting the allegation in issue. (*Watson vs. Palmer*, 5 *Ark.* 501; *Burr vs. Burton, ante.*(

**424**              CASES IN THE SUPREME COURT

Biscoe et al. vs. Coulter et al.              [JANUARY

The testimony of the collector of taxes, if competent for such a purpose, is not suffi-
cient to overturn and defeat a tax title to land acquired by purchase from the Audi-
tor, by impeaching the truth of his own official return, attested by the clerk of the
county, as to the mode of offering the lands for sale.

If lands are subject to taxation, they are subject to sale for taxes, the right to tax
involving the power to enforce payment by sale of the lands.

Under *section* 1, *chapter* 139, *Dig.* all lands are made subject to taxation except such as
are exempt therefrom by the compact between the State and the United States; and
there is no statute exempting the lands mortgaged to the Real Estate Bank from
taxation; such exemption cannot arise, by implication, from the fact that the State
has a contingent mortgage interest in the land.

Under our statute the land itself is sold for taxes, and not the particular interest or
title of the person to whom the land is assessed; and though lands belonging to the
State would be exempt from taxation and sale, the State cannot be regarded as the
owner of the lands mortgaged to the Real Estate Bank, to secure the stock notes,
so as to exempt them from taxation.

*Appeal from the Circuit Court of Sevier county in Chancery.*

The Hon. SHELTON WATSON, Circuit Judge.

PIKE & CUMMINS for the appellants, argued at considerable
length, that upon the sale of the bonds of the State issued to
the Real Estate Bank, it became as impossible for the State to
tax the lands mortgaged by the stockholders of the bank to se-
cure their stock bonds, for a tax imposed upon the owners of
the lands, as to tax her own absolute property. That if the
State could tax the mortgaged lands at all, it was the mere tax
on the equity of redemption; that if she could sell at all, the
sale merely passed the equity of redemption; that if the tax
created any charge on the lands, it was junior to the mortgage
liens; that the sale was only of the equity of redemption sub-
ject to all the liens created by the mortgages; and that the trus-
tees are entitled to have their decree of foreclosure executed.

That the collector must comply with all the requisites of the
law, (*sec.* 98, *ch.* 139, *Rev. Stat.*,) or his sale carries no title.
His total failure to offer the land at all, certainly destroys all
claim of the State and the assignee. (*Hodge vs. Wilson*, 12
*Smed. & Marsh.* 498.

That although Hartfield was a non-resident, yet the lands

mortgaged to Hamilton and Wright, who were residents of the county, were conveyed to them previously to the assessment. At law the mortgagee holds the fee, and it was illegal therefore to double tax these lands as the lands of a non-resident.

WATKINS & GALLAGHER, for the appellees, contended, that parol evidence cannot be admitted to disprove the return of an officer in a collateral proceeding, and that the testimony of the collector was wholly inadmissible. (*Trigg vs. Lewis*, 3 *Littell* 131; *Newton vs. State Bank*, 14 *Ark. Rep.* 12.) But if the testimony were admissible to contradict his official return, it shows a sufficient, if not literal, compliance with the provisions of the statute.

That it does not appear from the evidence that the lands were taxed at double their value; but the statute expressly requires the lands of non-residents to be assessed at double their value, if they fail to furnish a list of them for assessment; (*Dig. ch.* 139 *p.* 873). But if any person be aggrieved by any assessment, he may apply to the county court to have the same corrected; and upon failure to do so, the assessment is conclusive. *Dig. ch.* 139, *sec.* 28; 6 *Pick.* 98; 4 *Wend.* 227; 3 *Mass.* 306; 6 *ib.* 44; 10 *Shepley* 269; 15 *Verm.* 460; 9 *Metc.* 191; 6 *Watts* 325.

That it is immaterial whether the land was taxed in the name of the owner or of the mortgagee—the owner was bound to see the taxes paid. *Merrick & Fenno vs. Hutt*, 15 *Ark.* 37; 6 *N. Hamp.* 194; 1 *Watts & Serg.* 166.

That the lands mortgaged to the Real Estate Bank for stock are liable to sale for taxes, the State being in no sense the owner of them, nor trustee for the owners: that the lands, and not the particular or limited interest of the party in whose name they were assessed, passed by the sale.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 29th of January, 1850, Biscoe and others, trustees of the Real Estate Bank, filed a bill in the Sevier Circuit Court, against David R. Coulter, Turner H. Buckner, William Wright, Benjamin F. Hawkins, Henry K. Brown, and Wm. Moss, "to

carry decree into execution, of revivor, and in the nature of a supplemental bill."

The bill sets out and exhibits the deed of assignment by which the Real Estate Bank, on the 2d of April, 1842, transferred to trustees all its assets for the benefit of its creditors; and the several occurrences by which the complainants became trustees under the provisions of the deed.

The bill further alleges that one Benj. H. G. Hartfield was a subscriber for ninety-six shares of the capital stock of the Real Estate Bank, for which he made his bond for $9,600, dated 10th June 1837, and due 26th Oct., 1861. To secure the payment of which, and any money that he might borrow upon his stock credit, he executed to the Bank, under the provisions of its charter, a mortgage on the 10th of June, 1837, and another on the 28th April, 1841, upon the *S. E.* ¼ *of Sec.* 1, and the *E.* ½ *of the N. E.* ¼ *of Sec.* 12, *in T.* 13 *S. of R.* 33 *West*, which mortgages were duly acknowledged and recorded in Sevier county, where the lands were situated.

On the 16th of April, 1840, Hartfield borrowed of the Bank, on his stock credit, $2,945 33, for which he gave his note, with *Robert Hamilton* and *Benj. F. Hawkins* as securities, payable at twelve months from 19th April, 1840.

On the 21st of December, 1839, he borrowed on the same account $1,566 67, for which he made his note to the Bank, with *Henry K. Brown* and *Wm. Moss* as securities, payable twelve months after its date.

These stock notes remaining unpaid after maturity, the trustees of the Bank filed a bill in the Sevier Circuit Court for foreclosure of said mortgages, and payment of the notes. Afterwards, ascertaining that, on the 8th of April, 1844, Hartfield had mortgaged to Hamilton and Hawkins, the *W.* ½ *of the S. W.* ¼ *of Sec.* 6, *in T.* 13 *S. of R.* 32 *West;* and *N. E.* ¼ *of Sec.* 1 *T.* 13 *S. R.* 33 *W.*, to secure and save them harmless as his securities on the note first above mentioned, the trustees filed an amendment to their bill, stating this fact, and praying to be subrogated to the rights of the securities under the mortgage to them; and to have foreclosure thereof.

This bill being against Hartfield, Hamilton, Hawkins, Brown and Moss, the trustees obtained a decree, by consent, on the 16th of April, 1846, for foreclosure of both mortgages and payment of the amount due on the two notes, the lands mortgaged by Hartfield to the Bank to be first sold, and then those mortgaged by him to his securities, if the first failed to satisfy the decree. Brittin was appointed a commissioner to make the sale, but he died in June 1846, and no sale was made, and the decree remained unexecuted to the time of filing the present bill to carry it into execution, etc.

About the time of filing the original bill, the trustees also brought suits at law upon the notes, against Hartfield, Brown and Moss, in Hempstead, and Hartfield, Hamilton and Hawkins in Sevier county. Hartfield, having removed to Texas, his securities applied to the trustees of the Bank late in the year 1845 or early in 1846, and proposed that Hartfield should give up all the mortgaged lands, and also the following lands, and he and they be released from said debts, to wit: the $E. \frac{1}{2} N. W. \frac{1}{4}$ Sec. 1, T. 13 S. R. 33 W., and the W. frl. $\frac{1}{2}$ N. W. $\frac{1}{4}$ Sec. 6, in T. 13 S. R. 32 W., lying in Sevier county, the title to which two tracts, and some of the other lands being in one Wm. Wright. On the representations of the securities, and especially Brown and Hawkins, that the title was good, and the lands unincumbered, the trustees agreed to this proposition.

Thereupon the sureties procured Hartfield to return from Texas to complete this arrangement; and about the 15th April, 1846, it was finally agreed that the trustees would take said lands in full payment of Hartfield's debts, and release him and his securities therefrom. That the suit in chancery should proceed to foreclosure, and title be obtained by the trustees to the mortgaged lands by purchase under the decree, and that Wright should convey to them the lands to which he held the title.

Accordingly, on the 15th April, 1846, Wright conveyed to the trustees the $E\frac{1}{2}$ of the N. W. $\frac{1}{4}$, and the N. E. $\frac{1}{4}$ of sec. 1, in T. 13 S., R. 33 W.; and the W. frl. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$, and the W. frl. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of sec. 6, in T. 13 S., R. 32 W., by deed

duly acknowledged and recorded, with covenants of warranty. On this being done, the suits at law were dismissed, and the decree of foreclosure taken, that the trustees might obtain title to all of said lands, by sale and purchase under the decree.

The lands, and the titles which the trustees expected to obtain by the above arrangement, are as follows:

No. 1, S. E. ¼ sec. 1, (mortgages No. 1 and 2 and decree,) 160 acres.

No. 2, E. ½ of N. E. ¼, sec. 12, (mortgages No. 1 and 2 and decree,) 80 acres.

No. 3, N. E. ¼ sec. 1, (mortgage No. 3, decree and deed from Wright,) 160 acres.

No. 4, E. ½ of N. W. ¼, sec. 1, (deed from Wright,) 80 acres.

No. 5, W. frl. ½ of S. W. ¼, sec. 6, (mortgage No. 3 and deed from Wright,) 104.64 acres.

No. 6, W. frl. ½ N. W. ¼, sec. 6, (deed from Wright,) 105.52 acres.

Nos. 1, 2, 3 and 4, being in *T.* 13 *S.*, *R.* 33 *W.*, and Nos. 5 and 6, in *T.* 13 *S.*, *R.* 32 *W.*

The bill further alleges that it turned out that all of these lands were assessed for the taxes of 1844 and 1845, by the sheriff of Sevier county, as the property of Hartfield, a non-resident. On the 13th September, 1845, he advertised them, in some way, to be sold for taxes on the 1st Monday, (being 3d day) of November, 1845. The lands were assessed at $6 per acre, or for their whole value $8,694. The sheriff never legally advertised the lands; in point of fact, never sold them, or offered them for sale at all, but reported them to the Auditor as struck off and forfeited to the State for non-payment of taxes for 1844–'5; on the 3d Nov. 1845, he reported the taxes and penalty on them to be as follows:

No. 1, State tax and penalty, $3 00; county tax and penalty, $6 90.

No. 2, State tax and penalty, $1 50; county tax and penalty $3 45.

No. 3, State tax and penalty, $3 00; county tax and penalty, $6 90.

OF THE STATE OF ARKANSAS. 429

TERM, 1857.]                    Biscoe et al. vs. Coulter et al.

No. 4, State tax and penalty, $1 50; county tax and penalty, $3 45.

No. 5, State tax and penalty, $1 96; county tax and penalty, $4 51.

No. 6, State tax and penalty, $1 98; county tax and penalty, $4 55.

There was some mistake in the descrtption of No. 4 in some of the proceedings, but complainants do not insist upon it as a fatal objection.

The bill alleges that the lands were either never sold, or offered for sale at all, or if offered for sale, or sold, it was void; because the taxes for two years were added together, and the sale, if made, was for taxes and penalties for both years, without any right to sell for the taxes for 1844; that none of the lands had been omitted in the assessment list for 1844; that the sheriff had not paid all the taxes charged against him in 1844, so as to give him a lien on the lands, under which he could sell; and if he had such a lien he could not include the penalty.

But the said lands being pretended to be struck off and forfeited to the State, they were offered for sale by the Auditor, on the 14th of February, 1848, and not being sold for want of bidders, he sold them on the 28th of that month for the taxes, penalties and costs, to the defendants *Coulter* and *Buckner*, and executed to them a deed therefor.

That the two stock-mortgages of Hartfield were, by the provisions of the charter of the Real Estate Bank, transferred to the State and the bond-holders, so that when the lands included in these mortgages were, or were pretended to be struck off to the State, she had an interest in them as mortgagee.

That the trustees and their officers were wholly ignorant of the proceedings to forfeit the lands for taxes, and of Coulter and Buckner having purchased them of the Auditor, until the summer of 1849, always supposing, up to that time, that the taxes had been regularly paid. Coulter and Buckner had taken possession of the lands, and were using them as their own; and had commenced proceedings for confirmation of their title. Hamilton had died insolvent, and Hartfield was in Texas.

**430**      CASES IN THE SUPREME COURT

Biscoe et al. vs. Coulter et al.      [JANUARY]

The bill prayed revivor and execution of the decree of foreclosure, cancellation of the title of Coulter and Buckner, and an account from them of rents and profits, deducting taxes, penalty and costs justly chargeable to the trustees, etc. But if this relief could not be had, then the bill prayed a rescission of the agreement made by the trustees with Hartfield's securities, to take the lands in payment of the debts; and decree against Hawkins, Moss and Brown to pay the amounts for which they were respectively sureties; and against *Wright* on his warranty for the value of the lands conveyed by him to the trustees; and for general relief.

*Coulter* and *Buckner* filed a joint answer. As to their title, they allege that the lands were regularly listed, assessed and placed upon the tax books of Sevier county in 1845, for the State and county taxes assessed and due thereon for the years 1844 and 1845, in the name of Hartfield as, and who then was, a non-resident. That the taxes remaining wholly unpaid, the sheriff and collector made out and transmitted to the Auditor, and also filed in the office of the clerk of said county, a list of all lands assessed for taxes in the year 1845, belonging to non-residents, including those assessed to Hartfield, stating the amount of State and county taxes due thereon and unpaid. That no one having paid the taxes assessed against Hartfield, into the State Treasury, the Auditor, after correcting and adjusting the list, caused a notice to be published, as from the said sheriff and collector, on the 24th Sept., 1845, in the "Arkansas Banner," at Little Rock, that the lands in the list so corrected, which was there published, including Hartfield's, would be sold for taxes, etc., by said collector, at the Courthouse door in said county, on the first Monday of Nov., 1845, unless the taxes, penalty and costs were previously paid. That the taxes, etc., on Hartfield's lands remaining wholly unpaid, the said collector, in pursuance of the notice, did proceed, at the time and place named therein, to offer and expose for sale, separately, each of the tracts of land assessed to Hartfield, and no person bidding for either tract, each was declared and entered as forfeited, and sold to the State in pursuance of law,

etc. That the clerk of the county attended the sale, and made a regular record of it in the book kept for that purpose, showing the sale to the State of Hartfield's lands, and the amount of taxes, penalty, etc., due on each tract, a copy of which record was by him sent in due time to the Auditor. That the lands in question were not assessed in 1844, nor put on the tax book for that year, but were omitted by mistake, and, therefore, assessed for both years in 1845. That the proceedings of the sheriff and collector were regular, and in accordance with the statute throughout· That he did not sell for taxes of 1844, under any lien that he had or claimed, but because the lands were not assessed in that year. That the taxes, etc., charged upon each tract, are correctly stated in the bill, and are not excessive, etc.

The answer admits that the lands were offered for sale, as forfeited lands, by the Auditor, on the 2d Monday of February, 1848, and not sold for want of bidders. That on the 25th of the same month, respondents paid to the Auditor all the State and county taxes, interest, penalties, costs, etc., due thereon, and thereby purchased the said lands of the State, and obtained the Auditor's deeds therefor, etc.

They admit that the stock mortgages executed by Hartfield upon part of the lands, were, by the provisions of the charter of the Bank, transferred to the State to indemnify her on account of the bonds issued by her for the Bank; that complainants were trustees for the State; and that, at the time the lands were forfeited, the State had an interest therein as mortgagee; but they insist that this rather strengthened than prejudiced the title of respondents, inasmuch as the State, through the Auditor, voluntarily and for a valuable consideration, sold and conveyed to them all her *right, title, interest* and *claim*, in and to said lands—and that complainants, being mere trustees of the State, were estopped from controverting the title of respondents, even if the collector had not conformed to the statute in the proceedings which resulted in a forfeiture of the lands, etc.

Respondents did not know what knowledge complainants

had of the sale of said lands for taxes, etc., but they insist that the lands being regularly advertised, etc., complainants had the same notice that other land holders have; that it was their duty to pay the taxes; they were chargeable with notice, and were bound to take notice at their peril.

The other defendants answered the bill also, but by consent of all the parties, the case, as between complainants on one side, and Coulter and Buckner on the other, was heard by itself, without prejudice to the right of the complainants afterwards to bring on, like a separate case, that between themselves and Hartfield's securities and Wright. It is, therefore, unnecessary to make any statement of the other answers.

The complainants filed a replication to the answer of Coulter and Buckner, and on the final hearing, the bill was dismissed as to them for want of equity; and complainants appealed.

The validity of the tax title of the appellees is the only matter of controversy involved in this branch of the case.

It seems from the pleadings and evidence in the cause, that the appellees purchased the lands in question from the Auditor, under the provisions of *sec*. 144–'5–'6–'7, *ch*. 139, *Dig*. *p*. 894; and received his deed for each tract thereof.

These deeds are as good and valid, and have the same force and effect as deeds made by the Auditor for lands sold by him at public auction, etc. *Ib. sec*. 147.

The Auditor's deed for land sold by him at public auction (*under sec*. 131 *to* 143, *ch*. 139, *Dig*.,) is to be treated in the Courts as *prima facie* " evidence that all things required by law to be done to make a good and valid sale, were done by the collector and the Auditor." *Sec*. 142. *Merrick & Fenno vs. Hutt*, 15 *Ark*. 331.

In order to avoid the title of appellees, therefore, it was incumbent upon the appellants, who assailed the title, to show affirmatively a non-compliance with some substantial requisite of the law, in the proceedings which ultimately resulted in a sale of the lands, by the Auditor, to the appellees. *Merrick & vs. Hutt, ubi sup. Patrick vs. Davis*, 15 *Ark*. 363.

The evidence read upon the hearing conduces to sustain but

one of the objections made by the appellants to the regularity of the proceedings of the collector, etc.; that is, that he did not offer the lands for sale, at the time they were forfeited to the State, in the mode prescribed by law.

On this point, the deposition of Jackson, the collector, is as follows:

" The lands of Hartfield, with others, were advertised to be sold at the time and place prescribed by law. At the time appointed for the sale, I, as collector, etc., attended at the Court-house door of Sevier county. Ira N. Holman, the clerk of the county, and Fred. L. Riddy (an attorney,) were the only persons present. I made known that I would sell said lands for the taxes; and Holman and Riddy said they would not buy any of them. I then struck off said lands as forfeited to the State. There being no persons present but those above named, and they saying that they would not buy any of said lands, I did not go over the lands offering each tract separately. I refer to the lands assessed to Hartfield, as well as those assessed to other persons, which were advertised for sale at that time."

Cross-examined by appellees—" I had, at the time and place of said sale, a list of said lands, and announced and made known that if either of said persons would bid for any tract of said lands, I would cry it; and they said they would not bid for any of them. I had a list of the lands, and exhibited it at the time. If either of the persons present would have bid for the lands, I would have cried the tracts separately, and told them so. The town of Paraclifta, the place of sale, was very obscure and thinly inhabited—But few persons then residing in it— Only five or six men—But few persons living near the town, the settlements being a considerable distance off. It was not usual for many persons to congregate at the town except at Court, and other public days. I was sheriff of Sevier county from 1840 to 1848. At the time of said sale, and for some time before and after, the opinion prevailed to a considerable extent in the county, that tax titles were worthless, and but few persons were disposed to buy at such sales. I do not recollect that any persons were in town on the day of sale except the citi-

zens. I offered the lands for sale at the Court-house door between 10 o'clock A. M. and 3 o'clock P. M. publicly. The sale was conducted as public sales usually are, there being no means used, within my knowledge or belief, to prevent persons from attending it."

*Re-examined by appellants.*—"In the above statements, I refer not only to the lands assessed to Hartfield, but to all lands advertised for sale at the time referred to. The whole list of lands then offered for sale, were stricken off in the same way, there being eleven tracts besides Hartfield's lands. But I had the list there, and exhibited the same, so persons could see if they wished to do so. I do not know that the persons present knew the numbers of the lands, but they might have seen the list containing the description of the lands, if they wished to do so. According to my recollection, I did not cry the amount of taxes due on each tract."

Re-cross examined by appellees:—" said lands had been advertised at the Court house door, in said town of Paraclifta; and Holman, the clerk, kept his office in a few yards of the Courthouse door, and *Riddy*, the lawyer, resided in the town, about 150 yards from the Court-house. At the time of the sale, I had the advertisement, or a copy, containing a description of said lands."

This appears to have been the only deposition read upon the hearing. It was read by agreement of parties, with an express reservation of objections to competency and relevancy.

The proceedings of the collector being regular up to the time of sale, his power to sell the lands was complete. The objection made to the validity of his sale of the lands to the State, does not relate to his *power to make the sale*, but to the *manner* in which he *exercised* the power. The objection is, that he did not cry the lands by *separate tracts*.

The law required the collector to offer for sale, separately, each tract of land contained in the advertised list, etc. *Dig. ch.* 139, *sec.* 98.

The person offering at such sale to pay the taxes, etc., on

OF THE STATE OF ARKANSAS. **435**

Term, 1857.]                 Biscoe et al. vs. Coulter et al.

any tract for the least quantity, becomes the purchaser of such quantity. *Ib sec.* 99.

Every tract of land so offered for sale; and not sold for want of bidders, is entered as sold or forfeited to the State, etc. *Ib. sec.* 104, 116.

It is insisted by the appellants that if the collector had offered and cried each tract of the lands in question separately, one of the persons present might have bid, and agreed to pay the taxes, etc., due on each tract for a less quantity than the whole of the tract, and thereby have saved to the owner the remainder.

From all the facts stated by the collector, however, the probability is very strong that the result would have been as it was, had he gone through the form of offering each tract separately, because it seems that the only two persons present stated to him distinctly, after he had exhibited a list of the lands, that they would not bid for any of them. Supposing, therefore, the deposition of the collector to be competent, and all the facts stated by him to be true, it is but fair to presume that no injury resulted to the owner of the lands by the failure of the collector to comply with the letter of the Statute, in the mode of offering the lands for sale. See *Blackwell on Tax Titles*, ch. 14 *p.* 305, *et seqr.*

The mode of offering lands for sale prescribed by the statute, however, is simple and just, and we would not encourage or sanction any substantial departure from it, under any circumstances.

But if the irregularity in question were fatal to the title of the appellees, can the deposition of the collector, be regarded as competent and sufficient to establish such irregularity against the other evidence in the cause?

The bill alleges the irregularity. The answer denies it, and avers that the lands were offered by separate tracts. The denial is responsive to the allegation of the bill, but the matter alleged not being within the peculiar knowledge of the respondents, the answer will be treated as merely putting the allega-

**436** CASES IN THE SUPREME COURT

Biscoe et al. vs. Coulter et al. [JANUARY

tion in issue. *Watson vs. Palmer*, 5 *Ark.* 501; *Burr vs. Burton*, 17 *Ark.*

The *onus probandi* was upon the appellants. The only evidence produced by them was the deposition of the collector.

The appellees produced the Auditor's deeds, which, as we have seen, were *prima facie* evidence of the regularity of all the proceedings of the collector.

Moreover, the clerk of the County Court is required to attend such sales of lands for taxes made by the collector, and make a record thereof in a book, etc., describing the several tracts of land, etc., as they are described in the (collector's) list, stating, in separate columns, the State and county tax, with the penalty thereon, and how much of each tract, etc., was sold, and to whom sold; and such tracts as remain unsold, for want of bidders, he is required to enter as sold to the State. *Dig. ch.* 139, *sec.* 104.

He is required also to make out and certify a copy of such record to the Auditor, etc., *sec.* 105.

It appears that Holman, the clerk of the County Court of Sevier county, attended the sale in question, and in compliance with the statute, kept a record thereof, and certified a copy of such record to the auditor, showing that the six tracts of land assessed to Hartfield, describing the numbers of each tract, with the amount of taxes, etc., due thereon, were not sold for want of bidders, and entered in such record as sold to the State.

The clerk was acting in his official capacity, and made the record and return to the auditor under his official oath, and such return must necessarily be regarded as some evidence that the several tracts of land had been offered for sale in accordance with law, and forfeited to the State for the want of bidders.

Furthermore, the statute made it the duty of the collector, immediately after such sale, to make out a correct list of all lands that were forfeited to the State, at such sale, for want of bidders, under his hand, and attested by the clerk of the County Court, and to cause the same to be recorded in the recorder's office of his county; and declares that it shall be evidence, in all Courts of this State, that the title to each and every tract of

OF THE STATE OF ARKANSAS. 437

TERM, 1857 ]                    Biscoe et al. vs. Coulter et al.

land, etc., contained in such list, has passed to, and vested in, the State.  *Dig. ch.* 139, *sec.* 117.

It appears that, in compliance with this statute, the collector returned a list, attested by the clerk, embracing the several tracts of land assessed to Hartfield, and showing that they had been offered for sale, and stricken off to the State for want of bidders, etc.

This return was also made upon the official oath of the collector as well as the clerk.

By these returns, the collector and the clerk had placed upon the public records evidence, under their official oaths, that the several tracts of land assessed to Hartfield had been offered for sale in accordance with law, and forfeited to the State for want of bidders.  We say *had been offered for sale in accordance with law*, because if they had not been so substantially offered for sale, both the collector and the clerk were guilty of fraud, if not of official perjury, in making their returns.

The appellees finding, as we must suppose, such evidence upon the public records that the lands in question had been regularly forfeited to the State, purchased them of the auditor, in good faith, as it may be presumed in the absence of any showing to the contrary, paid their money for them, and entered into possession of them.

Now shall the collector be permitted to overturn and defeat their title by impeaching the truth of his own official returns?

The decisions seem not to be in harmony as to the competency of the officer to be a witness to impeach the truth of his return.  In some cases he has been held to be incompetent; in others the objection has been put to his credibility.  See *Meredith vs. Shewall*, 1 *Penn. R* 496.  *Carpenter vs. Sawyer et al.*, 17 *Verm.* 123.  4 *Cowen & Hill's notes, Phil. Ev. p.* 801, 2, and cases cited.

In the case of *Tucker vs. Wilamowicz*, 3 *Eng. R.* 166, this Court adopts the comprehensive rule "that every person not interested in the event of the suit, nor incapacitated by his religious tenets, nor by the commission of an infamous crime, is

a competent witness. All other circumstances affect his credit only."

If this rule can be regarded as applicable to the competency of an officer to impeach his official return, and if he must be held competent, notwithstanding the many considerations of public policy against it, yet his credibility, is so deeply affected that his evidence could have but little weight. Because, having made his return upon his official oath, and rights having grown up under it, when he is offered as a witness to impeach the truth of that return, it is not only oath against oath, but the integrity of his motives in impeaching the return may well be questioned.

Upon the state of the pleadings, and the whole of the evidence in this case, we shall therefore hold that the deposition of the collector is not sufficient to invalidate and overturn the title of the appellees to the lands in question.

It may be further remarked that the facts appearing upon the record before us, show no such diligence on the part of the appellants in reference to the preservation of their rights to the lands in question, as to give them any peculiar claim to relief in a Court of equity as against the appellees. It appears that they filed the original bill to foreclose their mortgages upon part of the lands in January, 1845, after which the lands were advertised for sale by the collector, etc., and forfeited to the State in November following. That the advertisement was published in a newspaper printed in Little Rock, where, under the deed of assignment, the trustees held their meetings, and their cashier and attorney kept their offices. That in April, 1846, the appellants perfected the arrangement with Hartfield and his securities, by which they were to have acquired title to all the lands. That it was about eighteen months after this, before the time expired in which they had the right, under the statute, to redeem the lands from the auditor, by paying the taxes, etc., for which they had been forfeited to the State. That after the expiration of two years from the time of forfeiture, the auditor again advertised the lands for sale, in a newspaper printed in Little Rock, and on the 2d Monday of February, 1848,

publicly offered them for sale for the taxes, etc., due upon them, and they were not sold for want of bidders. After this, they were purchased of the auditor by the appellees. During all this time, and whilst, all these public proceedings were taking place, the appellants seem to have paid no attention to the payment of taxes upon the lands.

The counsel for appellants have devoted most of their argument in this case, to the proposition that the two tracts of land embraced in Hartfield's stock mortgages to the Real Estate Bank, were not subject to sale for taxes, or if subject to sale, that only Hartfield's equity of redemption could be sold, and that the lands would remain subject to the lien of the mortgages, etc. This proposition applies to all the lands mortgaged to the bank to secure the payment of stock, etc.

It appears that there were 207,101 acres of these lands, valued by commissioners at $3,380,772 38 (*Gouge's Rep. p.* 5.) By the terms of the mortgages, the mortgagors were to remain in the use and occupation of the lands until the maturity of the debts secured by the mortgages, and default of payment. The bonds given for stock subscriptions do not mature until the year 1861. In equity, the lands are regarded as belonging to the mortgagors until default, etc. The mortgages are merely securities for the debts, etc.

If these lands were not subject to sale for taxes, they were not subject to taxation, because the right to tax, without the power to enforce payment by sale of the lands, would be of no avail. The consequence of the affirmative of the proposition would be, that the owners of this vast amount of lands might have remained in their possession and use from the execution until the maturity of the mortgages, without the payment of any taxes upon them.

By *section* 1 *chap.* 139 *Dig. p.* 870, all lands, etc., are made subject to taxation except such as are exempt therefrom by the compact between the State and the United States.

It is said that no species of property is ever to be regarded as exempt from the operation of the taxing power, unless by vir-

tue of some positive law—such exemption can never arise by implication. *Blackwell on Tax Titles p.* 633.

Waiving any question as to the power of the legislature to exempt particular lands from taxes, where lands generally are taxed, we know of no statute exempting the lands mortgaged to the Real Estate Bank from taxation.

The other branch of the proposition, that if the lands were subject to sale for taxes at all, only the equity of redemption of the mortgagor could be sold, is equally untenable. Under our statute the *land* itself is sold for taxes, and not the particular interest or title of the person to whom it is assessed. A full and perfect title to the land passes by the sale, where the proceedings are regular. See *Dig. ch.* 139, *sec's* 92, 112, 116, 117, 142, 147.

Lands belonging to the State, of course, would be exempt from taxation. They are not embraced within the object and intention of the statute. The object of the statute is to raise a revenue from land, etc., for the support of the government. If the lands of the State were taxed, the taxes would have to be paid out of the public treasury, and of course no revenue would be gained by the operation, but a loss to the extent of the costs of assessing and collecting the taxes.

But the State cannot be regarded as the owner of the lands mortgaged to the Real Estate Bank, in the sense referred to. She has but an ultimate interest as a mortgagee, to indemnify her against the payment of the bonds issued by her to the bank. See *Wilson vs. Biscoe et al.,* 6 *Eng.* 44.

It doubtless would be good policy for the legislature to pass an act making some provision for the preservation of the ultimate rights of the State in these lands, under the mortgages, but until this is done they must be held by the Court subject to existing revenue laws.

The decree of the Court below is affirmed.

Absent, the Hon. THOMAS B. HANLY.